UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DENNIS ROGERS,<br><br>       Plaintiff,<br><br>-against-<br><br>PETRÓLEO BRASILEIRO, S.A.,<br><br>       Defendant. | **MEMORANDUM OPINION<br>AND ORDER**<br><br>09 Civ. 08227 (PGG) |
| KEVIN BURLEW,<br><br>       Plaintiff,<br><br>-against-<br><br>PETRÓLEO BRASILEIRO, S.A.,<br><br>       Defendant. | 09 Civ. 08228 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

On September 25, 2009, Plaintiffs Dennis Rogers and Kevin Burlew initiated the above actions against Petróleo Brasileiro, S.A. ("Petrobrás"), alleging that Petrobrás committed breach of contract by failing to convert certain Petrobrás bearer bonds owned by Plaintiffs into preferred stock. (Docket No. 1)[1] On January 6, 2010, Petrobrás moved, pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6), to dismiss the actions for lack of jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq., and under the doctrine of forum non conveniens; and for failure to state a claim upon which relief can be granted. (09-cv-8227, Docket No. 5; 09-cv-

---

[1] The docket numbers are the same for both actions.

8228, Docket No. 7)  For the reasons stated below, Defendant's motions to dismiss will

be DENIED.

## BACKGROUND

      For purposes of deciding Defendant's motions to dismiss, the Court

assumes that the following factual allegations in the complaints[2] are true:

      Defendant Petrobrás is a Brazilian, government-owned oil company

created pursuant to Brazilian Law No. 2,004 on October 3, 1953.  (Petrobrás Ex. 5 at 1-2;

see Cmplt. ¶ 2)[3]  Petrobrás maintains an office at 570 Lexington Avenue, New York,

New York.  (Cmplt. ¶ 2)  Plaintiff Dennis Rogers is a citizen of  Florida (Rogers Cmplt.

¶ 1), and Plaintiff Kevin Burlew is a citizen of Connecticut (Burlew Cmplt. ¶ 1).  Rogers

and Burlew own Series 1, 3, and 4 Petrobrás bearer bonds.  (Cmplt. ¶ 5)  The complaints

do not describe how Plaintiffs acquired these bonds, but declarations submitted by

Plaintiffs in opposition to Defendant's motions state that the bonds at issue were

purchased in the United States with U.S. currency.  (Pltfs. Decs. ¶ 4)

      Petrobrás' Series 1 bearer bonds, issued on May 31, 1956, read as follows

(in translation):

---

[2]  In ruling on Defendant's motions to dismiss, this Court also considers documents
incorporated by reference in the complaints.  See, e.g., Kamholtz v. Yates County, 350
Fed. App'x 589, 591-92 (2d Cir. Oct. 29, 2009); Chambers v. Time Warner, Inc., 282
F.3d 147, 153 (2d Cir. 2002).  As discussed below, for purposes of determining
jurisdiction, the Court will also consider certain other evidence outside the pleadings.
See Makarova, 201 F.3d at 113; City of New York v. FDIC, 40 F. Supp. 2d 153, 160
(S.D.N.Y. 1999) (citing Kamen v. AT & T Co., 791 F.2d 1006, 1011 (2d Cir. 1986)).

[3]  The paragraph numbering in both complaints is identical.  Accordingly, citations to
"Cmplt. ¶ __" refer to both actions.  Where the Court wishes to distinguish between the
actions, it will refer to the complaints as "Rogers Cmplt. ¶ __" or "Burlew Cmplt ¶ __."

Petróleo Brasileiro, S.A. – Petrobrás – owes to the holder of this Certificate the amount of one thousand (1,000) cruzeiros corresponding to the contribution it received in 1954, pursuant to the provisions of Section 15 of Law No. 2,004 of October 2, 1953 . . . and it will pay to it, up to their redemption, per accrued semester, interests at 7% (seven percent) per year, in accordance with the resolution of the general shareholders' meeting in an extraordinary session held on December 20, 1955. . . .

The bearer obligations of this series are issued at this Company's discretion, pursuant to the provisions of Section 15 of Law No. 2,004, of October 3, 1953, and they are delivered to the holders of certificates of paid contributions by the owners of motor cars, in 1954. . . .

The following are conditions of this issuance:

1st) Redemption as from January 1, 1958, so that it is fully paid up on December 31, 1977;

2nd) The total or partial redemption may be advanced, either by purchase in the Stock Exchange, or by sort at par;

3rd) The obligations shall have interests at 7% per year, accrued per semester, as from January 1, 1955;

4th) The interests shall be paid semi-annually, in March and September each year;

5th) The Federal Government is jointly liable, in any case, for the nominal value of this bond, pursuant to the provisions of Section 15, of Law No. 2,004, of October 3, 1953;

6th) Petróleo Brasileiro S.A. – Petrobrás entitles to the holder of this obligation the option for receiving preferred nominative shares without voting rights, after the bond party meets the requirements of the Corporation Law and Section 18 of Law No. 2,004 of October 3, 1953.

(Petrobrás Ex. 1 (Series 1 bond))  The other Series bonds are identical, except that the

Series 3 bonds were issued on November 30, 1957, and had a redemption period from

January 1, 1960 to December 31, 1979 (Petrobrás Ex. 2 (Series 3 bond), and the Series 4

bonds were issued on February 17, 1959, and had a redemption period from January 1, 1961 to December 31, 1980.[4]  (Petrobrás Ex. 3 (Series 4 bond))

On June 22, 2009, Plaintiffs each sent a letter to Petrobrás' New York office requesting the conversion of their Petrobrás bearer bonds into preferred stock pursuant to the bonds' terms.  (Cmplt. ¶ 6; see also Pltfs. Ex. A).  On June 25, 2009, Theodore M. Helms, an Executive Manager of Investor Relations for Petrobrás, responded to Plaintiffs' letters by email, informing them that the office "regularly receive[s] inquiries about these bonds" and that the bonds "are no longer convertible." (Pltfs. Ex. C)  Helms attached a letter from Petrobrás' Investor Relations Department detailing the history and legal standing of the bonds in Brazil.  (Id.)  In relevant part, the letter states that the bonds "are over twenty years old, and holders who did not assert their rights in good time may not now claim the redemption value or request conversion.  The rights represented by these papers have lapsed, in accordance with Brazilian Civil Law and as stipulated on the back of these Bonds."  (Id.)

On September 25, 2009, Plaintiffs filed separate actions in this Court claiming breach of contract based on Petrobrás' refusal to convert the bonds into preferred shares.  (Docket No. 1)  Defendant filed its motions to dismiss on January 6, 2010.

---

[4]  Petrobrás has provided translations of the Series 1, 3, and 4 bearer bonds.  While it has provided both the certificate and terms (which appear to have been printed on the reverse of the bond certificate) for Series 1 and 4, it has only provided the certificate for Series 3. However, all three bonds contain identical language and Plaintiffs do not dispute that the terms for Series 3 are identical to those for Series 1 and 4.

## DISCUSSION

Defendant moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  A claim is "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  "When jurisdiction is challenged, the plaintiff 'bears the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists.'" Arar v. Ashcroft, 532 F.3d 157, 168 (2d Cir. 2008) (quoting APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003)).  In deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), courts may consider evidence outside the pleadings. See Makarova, 201 F.3d at 113; City of New York v. FDIC, 40 F. Supp. 2d 153, 160 (S.D.N.Y. 1999) (citing Kamen v. AT & T Co., 791 F.2d 1006, 1011 (2d Cir. 1986)).

A Rule 12(b)(6) motion, in contrast, challenges the legal sufficiency of the pleaded claims.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. --, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  To meet this standard, a complaint's factual allegations must permit the Court, "draw[ing] on its judicial experience and common sense," "to infer more than the mere possibility of misconduct."  Id. at 1950.  "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing

Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).  For purposes of a motion to dismiss, the "complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference," and the court may consider any document "which is integral to the complaint."  Int'l Audiotext Network, Inc. v. Am. Tel. and Telegpaph Co., 62 F.3d 69, 72 (2d Cir. 1995).

In resolving Defendant's motions to dismiss for forum non conveniens, this Court may consider affidavits, affirmations and exhibits submitted in connection with the motions.  See Goldberg v. UBS AG, 660 F. Supp. 2d 410, 419 (S.D.N.Y. 2009) (citing cases); Kingsway Fin. Servs. v. Pricewaterhouse-Coopers, LLP, 420 F. Supp. 2d 228, 233 (S.D.N.Y. 2005) (citing cases stating that courts may consider affidavits and other evidence in considering a motion to dismiss on abstention grounds).

I.      **THIS COURT HAS SUBJECT MATTER JURISDICTION**

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602, et seq., is "the sole basis for obtaining jurisdiction over a foreign state" in United States courts.  Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989). The FSIA provides that a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604.

Under the FSIA, "foreign state" includes "an agency or instrumentality of a foreign state," defined as:

>any entity—
>
>(1) which is a separate legal person, corporate or otherwise, and
>
>(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other

6

> ownership interest is owned by a foreign state or political subdivision thereof, and
>
> (3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(a)-(b).

Petrobrás argues that because Brazil owns a majority of its common or voting shares, it is an organ of the Brazilian government and immune from suit under the FSIA.  (Def. Br. 6-11).  Plaintiffs argue that Petrobrás is not entitled to FSIA immunity, however, because Brazil does not own a majority of its shares when all classes of stock are considered.  At the very least, Plaintiffs argue, they should be permitted discovery as to whether Petrobrás is an organ of Brazil.  (Pltf. Br. 8-9)

Defendant's foreign state status merits little discussion.  Case law makes clear that Petrobrás is considered immune under the FSIA.  See U.S. Fidelity & Guar. Co. v. Braspetro Oil Servs., Co., 199 F.3d 94, 98 (2d Cir. 1999) (per curiam) (noting that "acts of Petrobras" were "[a]cts of the state" but upholding the exercise of subject matter jurisdiction over Petrobrás under the FSIA's commercial activity exception); Strata Heights Int'l Corp. v. Petroleo Brasileiro, S.A., Nos. 02-20645, 67 Fed. App'x 247, 02-20767, 2003 WL 21145663, at *4 (5th Cir. 2003) ("The district court properly applied the third clause of the commercial activity of the FSIA . . . to determine that Petrobras was not entitled to foreign sovereign immunity."); Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, 875 F.2d 1174, 1176 (5th Cir. 1989) ("Petrobras is entitled to sovereign immunity under the FSIA").

Because Petrobrás falls under the definition of a "foreign state," this Court must consider whether any of the FSIA's exceptions to immunity apply.  Petrobrás argues

that Plaintiffs fail to, and cannot, demonstrate that any of the three "commercial activity"

exceptions set forth in Section 1605 of the FSIA apply:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . .
>
> (2) in which the action is based upon a <u>commercial activity carried on in the United States</u> by the foreign state; or upon an <u>act performed in the United States</u> in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and <u>that act causes a direct effect</u> in the United States. . . .

28 U.S.C. § 1605(a) (emphasis added).

Plaintiffs argue that all three exceptions apply.  First, Plaintiffs

contend that the alleged breach of contract occurred in New York – when

Defendant's New York office rejected Plaintiffs' request to convert their bonds to

preferred stock – and arose from the Defendant's commercial activities in Brazil.

Second, Plaintiffs contend that Petrobrás' breach "is based on a

commercial activity carried on in the United States," as demonstrated by the

existence of Petrobrás' New York office, its SEC filings, and Helms' statement

that the New York office "regularly receive[s] inquiries about these bonds."

Lastly, Plaintiffs contend that even if the decision to refuse

conversion took place in Brazil, this refusal caused "a direct effect felt by Rogers

and Burlew in New York."  (Pltf. Br. 4-7)

The threshold inquiry of whether Defendant was engaged in "commercial

activity" sufficient to trigger the statutory exceptions to immunity is quickly resolved.

"Whether an activity is commercial is determined with reference to its nature rather than

its purpose," <u>Braka v. Bancomer, S.A.</u>, 589 F. Supp. 1465, 1469 (S.D.N.Y. 1984), <u>aff'd</u>,

762 F.2d 222 (2d Cir.1985) (citing 28 U.S.C. § 1603(d)), and the "legislative history suggests that courts should 'inquire whether the activity in question is one which private parties ordinarily perform or whether it is peculiarly within the realm of governments." Braka, 589 F. Supp. 1469 (citing Jurisdiction of U.S. Courts in Suits Against Foreign States:  Hearings on H.R. 11315 Before Subcomm. on Admin. Law and Gov't Relations of the House Comm. on the Judiciary, 94th Cong. 2d Sess. 53 (1976) (statement of Monroe Leigh, Legal Advisor, U.S. Dep't of State); accord Texas Trading & Milling Corp. v. Fed. Republic of Nigeria, 647 F.2d 300, 309 (2d Cir. 1981), cert. denied, 454 U.S. 1148 (1982), overruled in part by, Frontera Res. of Azerbaijan v. State Oil Co. of Azerbaijan Republic, 582 F.3d 393 (2d Cir. 2009).

Here, Petrobrás' issuance of bearer bonds is the underlying activity at issue.  This activity "is one which private parties ordinarily perform" and is not "peculiarly within the realm of governments."  Braka, 589 F. Supp. 1469.[5]  The Second Circuit and other courts have repeatedly held that "the issuing of public debt is a commercial activity within the meaning of Section 1605(a)(2)."  Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1018-1019 (2d Cir. 1991) (citing Carl Marks & Co. v. U.S.S.R., 841 F.2d 26, 27 (2d Cir.) (per curiam), cert. denied, 487 U.S. 1219 (1988); West v. Multibanco Comermex, S.A., 807 F.2d 820, 825 (9th Cir.), cert. denied, 482 U.S. 906 (1987); Braka, 589 F. Supp. at 1469-70 (S.D.N.Y.1984); Allied Bank Int'l v. Banco Credito Agricola, 566 F. Supp. 1440, 1443 (S.D.N.Y.1983), rev'd on other grounds, 757 F.2d 516 (2d Cir.), cert. dismissed, 473 U.S. 934 (1985); accord Republic of Argentina v.

---

[5]  For purposes of Section 1605(a)(2), the act of refusing to repay a financial instrument is "based upon" the issuance of that particular financial instrument.  See Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1018 (2d Cir. 1991).

Weltover, Inc., 504 U.S. 607, 615 (1992) (finding that the totality of the circumstances surrounding Argentina's issuance of bonds satisfied "commercial activity," while not explicitly reaching question of whether there was a per se rule).  Accordingly, this Court finds that Defendant was engaged in a commercial activity.

   The FSIA also requires "a nexus [] between the commercial activity in the United States and the cause of action."  Barkanic v. Gen. Admin. of Civil Aviation of the Peoples Republic of China, 822 F.2d 11, 13 (2d Cir. 1987) (citations omitted); accord Shapiro, 930 F.2d at 1018 (the issue under the first clause of Section 1605(a)(2) is "whether the particular conduct giving rise to the claim is a part of commercial activity having substantial contact with the United States") (citations omitted); Colonial Bank v. Compagnie Generale Maritime et Financiere, 645 F. Supp. 1457, 1463 (S.D.N.Y. 1986); Am. W. Airlines, Inc. v. GPA Grp., Ltd., 877 F.2d 793, 796 (9th Cir. 1989) ("There must be a nexus between the defendant's commercial activity in the United States and the plaintiff's grievance."); H.R. Rep. No. 1487 at 17, reprinted in 1976 U.S.C.C.A.N. at 6615 (referring to "commercial transaction or act having a 'substantial contact' with the United States").  "[I]t is clear[, moreover,] that Congress intended a tighter nexus than the 'minimum contacts' standard for due process.'"  Shapiro, 930 F.2d at 1018 (citing Maritime Int'l Nominees Establishment v. Republic of Guinea, 693 F.2d 1094, 1109 (D.C.Cir.), cert. denied, 464 U.S. 815 (1983); Verlinden B.V. v. Cent. Bank of Nigeria, 488 F. Supp. 1284, 1296 (S.D.N.Y.1980), aff'd on other grounds, 647 F.2d 320 (2d Cir.1981), rev'd on other grounds, 461 U.S. 480 (1983); see also H.R. Rep. No. 1487 at 17, reprinted in 1976 U.S.C.C.A.N. at 6616 (statute was "intended to reflect a degree of

contact beyond that occasioned simply by U.S. citizenship or U.S. residence of the plaintiff").

   While Plaintiffs cite all three exceptions set forth in Section 1605(a)(2), they rely primarily on the exception concerning acts performed in the United States in connection with commercial activity elsewhere.  "This [exception] 'is generally understood to apply to non-commercial acts in the United States that relate to commercial acts abroad.'"  Kensington Int'l, Ltd. v. Itoua, 505 F.3d 147, 157 (2d Cir. 2007) (quoting Byrd v. Corporacion Forestal y Industrial de Olancho S.A., 182 F.3d 380, 390 (5th Cir. 1999)).  Plaintiffs argue that the "Complaints assert claims for breaches of contract that occurred in New York. . . . Thus, the breach by Petrobras of the contractual right of Rogers and Burlew to convert their Bonds into Petrobras preferred stock occurred in New York."  (Pltf. Br. 4)  Plaintiffs assert that they had no communication with Brazil, nor were they instructed to direct their conversion requests to any Brazilian office or representative.  (Id.)  Moreover, the record presently before this Court demonstrates that Defendant – from its New York office – communicated with U.S. clients and creditors about their rights under Petrobrás debt instruments.  Although the bonds were issued in Brazil and are denominated in Brazilian currency, the Complaints are based on actions the Defendant took in New York:  its communications to Plaintiffs that it would not honor the bonds' conversion provisions.

   Defendant argues that Plaintiffs' claims are not based upon an "act" performed in the United States, because "the document reflecting Petrobras' policy of rejecting conversion claims bears the address of Petrobras' Rio headquarters . . . and is in fact a translation of a Portuguese language document produced by that office."  (Reply 5)

While that may be, Defendant used its New York office and its New York representative to carry out and finalize the "act" of alleged breach at issue.  Accordingly, the "act performed in the United States" exception to sovereign immunity applies.

Even if the "act" exception did not apply, however – and no act related to Defendant's commercial activity in Brazil was "performed in" the United States, as Defendant argues – the "direct effect" exception provides a basis for jurisdiction.  In evaluating the applicability of the "direct effects" exception to FSIA immunity, courts "consider[] whether th[e] lawsuit is (1) based . . . upon an act outside the territory of the United States; (2) that was taken in connection with a commercial activity of [defendant] outside this country; and (3) that caused a direct effect in the United States."  Republic of Argentina, 504 U.S. at 611 (U.S. 1992) (internal citation and quotations omitted).

> For an act to have
>
> a "direct" effect within the meaning of the third clause of the commercial activity exception, the impact need not be either substantial or foreseeable, see Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 617-18, 112 S. Ct. 2160, 119 L. Ed. 2d 394 (1992) ("Weltover II"), aff'g 941 F.2d 145 (2d Cir. 1991) ("Weltover I"); rather, "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity,'" Weltover II, 504 U.S. at 618(quoting Weltover I, 941 F.2d at 152).  In Weltover I, we indicated that, by "immediate," we meant that, between the foreign state's commercial activity and the effect, there was no "intervening element." 941 F.2d at 152; see also Martin v. Republic of South Africa, 836 F.2d 91, 95 (2d Cir. 1987) ("Martin") ("The common sense interpretation of a 'direct effect'" within the meaning of § 1605(a) (2) "is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption." (other internal quotation marks omitted)).  We have held that "the requisite immediacy" is lacking where the alleged effect "depend[s] crucially on variables independent of" the conduct of the foreign state.  Virtual Countries, 300 F.3d at 238.

Guirlando v. T.C. Ziraat Bankasi A.S., 602 F.3d 69, 75 (2d Cir. 2010).

Here, even if the decision not to honor the bonds' conversion term was made in Brazil, Defendant communicated its rejection of Plaintiffs' conversion request through its New York representative. The immediate consequence of Defendant's rejection of Plaintiffs' conversion request was that Plaintiffs were denied the preferred shares to which they claim to be contractually entitled. It is well established that financial loss experienced through breach of contract may constitute a "direct effect." Morris v. People's Republic of China, 478 F. Supp. 2d 561, 568 (S.D.N.Y. 2007) (citing Texas Trading & Milling Corp., 647 F.2d at 312).

The "effect," however, must not only be "direct" but must have been felt in the United States. Mere citizenship or residency does not establish that direct effects were felt in the United States. Adler v. Federal Republic of Nigeria, 107 F.3d 720, 726-27 (9th Cir. 1997) (citations omitted); accord Guirlando, 602 F.3d at 78-79; Zedan v. Kingdom of Saudi Arabia, 849 F.2d 1511, 1515 (D.C. Cir. 1988). In such cases, "courts often look to the place where legally significant acts giving rise to the claim took place." Republic of Argentina v. Weltover (Weltover I), 941 F.2d 145, 152 (2d Cir.1991), aff'd, 504 U.S. 607 (1992) (citing Zedan, 849 F.2d at 1515); accord Morris, 478 F. Supp. 2d at 570 (holding that "the locus of contractual obligation" is essential to deciding whether a direct effect occurred in the United States) (citing Virtual Countries, Inc. v. Republic of South Africa, 300 F.3d 230, 240 (2d Cir. 2002)).

In cases involving the legally significant act of failing to honor or repay financial instruments, for example, the "nonpayment of a commercial obligation by a foreign state or its instrumentality has a direct effect in the United States if the defaulting party was contractually obligated to pay here." Dar el-Bina Eng'g & Contracting Co. v.

13

Republic of Iraq, 79 F. Supp. 2d 374, 382 (S.D.N.Y. 2000).  The Second Circuit has

found a direct effect where the defaulting party agreed to make payments in one of

several enumerated cities, including New York, Weltover I, 941 F.2d 145, and where the

defaulting party agreed in advance to make payments per payee's instructions and payee

chose a New York bank.  Hanil Bank v. PT. Bank Negara Indonesia, 148 F.3d 127 (2d

Cir. 1998).

   Here, the plain language of the bonds neither limits nor indicates the place

of exchange or redemption, but broadly reads:  "Petrobrás entitles to the holder of this

obligation the option for receiving preferred nominative shares without voting rights,

after the bond party meets the Corporation Law and Section 18 of Law No. 2,004 of

October 3, 1953."  (Petrobrás Exs. 1 (Series 1 bearer bond) & 3 (Series 4 bearer bond))

Nor do the bonds place any restrictions on negotiability or sale outside of Brazil.  That

the bonds do not specify or require a place of payment or exchange within the United

States does not foreclose that Plaintiffs reasonably expected they could make such a

request in New York, given the open ended terms of the bonds and the fact that Petrobrás

has a New York office.  See United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,

No. 97 Civ. 6124 (JGK), 1999 U.S. Dist. LEXIS 7236, at **40-41 (S.D.N.Y. May 13,

1999) (finding direct effect where bonds "understood to be (although not contractually

obliged to be) payable in New York").  Defendant was free to limit the terms of the

bearer bonds by restricting their negotiability and place of redemption or exchange, but it

did not do so.  Moreover, Defendant does not argue that it would not have had to honor

redemption or conversion requests made in the United States if such a request had been

made prior to the "lapse" of an investor's redemption or conversion right.  (Pltfs. Ex. C)

Because Plaintiffs are and were U.S. residents, purchased the bonds in the United States

with U.S. currency, communicated with Petrobrás' New York representative at its New

York office regarding these bonds, and were told by that New York representative that

Petrobrás would not honor the bonds' conversion provision, this Court finds that the

direct effect of Defendant's alleged breach was felt within the United States.[6]

## II.    THIS ACTION WILL NOT BE DISMISSED
##         ON GROUNDS OF *FORUM NON CONVENIENS*

Defendant next argues that these actions should be dismissed on grounds

of forum non conveniens.  (Def. Br. 13)

------------------------------

[6]  Morris, 478 F. Supp. 2d 561, cited by Defendant, is readily distinguished.  In Morris,
the court held that no direct effect was felt in the United States because numerous factors
apart from the plaintiff's citizenship "all point[ed] abroad," and the default occurred
before plaintiff owned the bonds:

> the only evidence of a nexus with the United States clearly presented to
> the Court is plaintiff's citizenship, coupled with his purchase of eight
> bonds over sixty years after they went into default.  There is no evidence
> before the Court of prior ownership of plaintiff's bonds by U.S. citizens or
> corporations at the time of any default.  No issuing banks were located in
> the United States, as a result of President Woodrow Wilson's explicit
> decision not to support domestic bank[s'] role in the issuance of the bonds.
> The PRC had no designated agent to administer the bonds in the United
> States.  No negotiations concerning the bond issuance or payment
> occurred within the United States.  The bonds were not issued or payable
> in U.S. currency.  And, importantly, the contractually designated locations
> where payments of principal and interest were to be paid were all in cities
> outside the United States.  Considering all the factors, the Court concludes
> that plaintiff suffered no "direct effect in the United States" sufficient to
> establish jurisdiction under the commercial activity exception of the FSIA.

Morris, 478 F. Supp. 2d at 570-71 (emphasis in original).  The facts alleged here are
entirely different.  The bonds at issue were purchased in the United States by United
States citizens with United States currency.  They were not in default at the time.
Defendant has an office and a representative located in New York charged with
administering the bonds.  Finally, the bonds did not limit redemption or conversion to
designated locations outside the United States.

The Supreme Court has "characterized <u>forum</u> <u>non</u> <u>conveniens</u> as, essentially, 'a supervening venue provision, permitting displacement of the ordinary rules of venue when, in light of certain conditions, the trial court thinks that jurisdiction ought to be declined.'" <u>Sinochem Int' Co. v. Malay. Int'l Shipping Corp.</u>, 549 U.S. 422, 429-30 (2007) (quoting <u>American Dredging Co. v. Miller</u>, 510 U.S. 443, 453 (1994)).  "The decision to dismiss a case on <u>forum</u> <u>non</u> <u>conveniens</u> grounds 'lies wholly within the broad discretion of the district court. . . .'" <u>Iragorri v. United Techs. Corp.</u>, 274 F.3d 65, 72 (2d Cir. 2001) (<u>en</u> <u>banc</u>) (quoting <u>Scottish Air Int'l, Inc. v. British Caledonian Group, PLC</u>, 81 F.3d 1224, 1232 (2d Cir. 1996)).  Dismissal based on <u>forum</u> <u>non</u> <u>conveniens</u> requires a three-step analysis:  (1) the court must "determine[] the degree of deference properly accorded the plaintiff's choice of forum"; (2) the court must consider "whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute"; and (3) the court must "balance[] the private and public interests implicated in the choice of forum."  <u>Norex Petroleum, Ltd. v. Access Indus.</u>, 416 F.3d 146, 153 (2d Cir. 2005).   "The burden of demonstrating that the plaintiff's chosen forum is not convenient is on the defendant seeking dismissal." <u>DiRenzio v. Philip Servs. Corp.</u>, 294 F.3d 21, 29 (2d Cir. 2002).  Because Defendant has failed to meet this burden, and because the interests at stake favor maintaining these actions in the United States, they will not be dismissed on <u>forum</u> <u>non</u> <u>conveniens</u> grounds.

A.   **Plaintiffs' Choice of Forum Deserves Deference**

"Any review of a <u>forum</u> <u>non</u> <u>conveniens</u> motion starts with 'a strong presumption in favor of the plaintiff's choice of forum.'" <u>Norex Petroleum, Ltd.</u>, 416 F.3d at 154 (quoting <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 255 (1981)).  Moreover, a "plaintiff's choice of forum is generally entitled to great deference when the plaintiff

16

has sued in the plaintiff's home forum." Iragorri, 274 F.3d at 71 (citing Koster v. (Am.) Lumbermens Mut. Cas. Co., 330 U.S. 518, 524 (1947); see also Piper, 454 U.S. at 255-56, 256 n.23. The Second Circuit has stated that "the degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations," Iragorri, 274 F.3d at 71, including whether the plaintiff is a U.S. citizen, "the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, [and] the availability of appropriate legal assistance." Plaintiff's choice of forum is entitled to less deference where it is based on "forum-shopping reasons" such as an "attempt[] to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States . . . [or] the plaintiff's popularity or the defendant's unpopularity in the region. . . ." Id. at 72.

    Analysis of these factors here indicates that deference to the Plaintiffs' forum choice is appropriate. While neither plaintiff lives in New York – Rogers is a citizen of Florida (Rogers Cmplt. ¶ 1) and Burlew is a citizen of Connecticut (Burlew Cmplt. ¶ 1) – they are both citizens of the United States who engaged in business communications with Defendant's New York office. Moreover, while "[t]he fact that a plaintiff is not a resident of the district in which he seeks to sue is not irrelevant, . . . [a] plaintiff should not be penalized for suing outside their home district." BFI Grp. Divino Corp., 298 Fed App'x at 90 (citing Iragorri, 274 F.3d at 73, 74; Piper Aircraft Co., 454 U.S. at 255 n.23). This is particularly true where the alternative forum is in a foreign country:

> In many circumstances, it will be far more convenient for a U.S. resident plaintiff to sue in a U.S. court than in a foreign country, even though it is not the district in which the plaintiff resides.  It is not a correct understanding of the rule to accord deference only when the suit is brought in the plaintiff's home district.

Iragorri, 274 F.3d at 73.

Here, Plaintiffs' choice of a New York forum is grounded in the fact that their communications with Petrobrás' New York City office provides the basis for their claims.  (Cmplt. ¶ 8).  Plaintiffs further argue that they do not have the resources to travel to and prosecute an action in Brazil.  (Rogers Decl. ¶ 5; Burlew Decl. ¶ 5; see Opp. at 16)  Nor have they ever lived in or travelled to Brazil.  They do not speak Portuguese.  (Rogers Decl. ¶ 3)  Accordingly, Plaintiffs face significant challenges in bringing these actions in Brazil.

Petrobrás claims that these actions should proceed in Brazil, because a majority of the relevant witnesses – including its employees and all of the other bondholders – reside in Brazil.  (Def. Br. 17; Reply 7-8)  Defendant does not explain, however, how testimony from Brazilian bondholders and Petrobrás employees will be relevant to Plaintiffs' breach of contract claim, or why Defendant could not have local counsel take declarations of any necessary witnesses in Brazil for use before this Court.  In any event, because Petrobrás has not identified any witnesses in Brazil, this factor does not weigh in favor of dismissal.

As to the other forum non conveniens factors, it appears that Petrobrás is amenable to suit in New York, as it has defended at least one other action in this district and has even initiated an action in this district – Petroleo Brasileiro S.A. v. IBE Grp.,

Inc., No. 93 Civ.3305 (TPG)), 1995 WL 326502 (S.D.N.Y. May 31, 1995).[7]  Petrobrás

also has ample financial resources[8] and has "retained highly competent New York

counsel who are fully capable of litigating this dispute in this forum."  Ancile Inv. Co.

Ltd. v. Archer Daniels Midland Co., No. 08 Civ. 9492(PAC), 2009 WL 3049604, at *6

(S.D.N.Y. Sept. 23, 2009).

   Petrobrás argues, however, that Plaintiffs "appear to be forum shopping to

avoid decisions of numerous Brazil[ian] courts . . . denying nearly identical claims under

the bearer bonds."  (Def. Br. 14-15)  Defendant does not assert, however, that U.S. law is

more favorable to Plaintiffs, or that U.S. law would even apply if the actions were

litigated in New York.  Moreover, while Petrobrás has submitted a number of Brazilian

court decisions allegedly holding that bond holders have no right to convert the Petrobrás

bonds at issue here after the redemption expiration date (see Def. Br. 15 (citing Exs. 6-

13)), Plaintiffs have submitted a declaration from Joao Augusto de Lima Lustosa, a

Brazilian attorney, asserting that "[u]nder Brazilian law, prior court decisions are not

regarded as having binding or substantial persuasive authority until several decisions by

the Superior Federal Court of Justice (Superior Tribunal de Justiçia) have been issued

with the same conclusions."  (Lustosa Decl. ¶ 3)  Petrobrás has not challenged, much less

refuted, Lustosa's statement regarding the non-binding nature of Brazilian case law from

lower courts.  (See Oliveira Decl. ¶ 5 (stating that "[a]lthough Brazilian court decisions

do not have automatic binding effect, precedents from all courts are considered

---

[7] See U.S. Fidelity & Guar. Co. v. Braspetro Oil Servs., Co., No. 97 CIV. 6124 (JGK), 98 CIV. 3099 (JGK), 2000 WL 744369 (S.D.N.Y. June 8, 2000).

[8] On its website, Petrobrás reported an annual net income of R$ 33 billion in 2008. (Gordon Decl., Ex. E at 2)

persuasive judicial authority")) Assuming <u>arguendo</u> that Brazilian law is unfavorable to Plaintiffs, such a finding does not support Defendant's forum shopping argument, because both parties concede that Brazilian law would be applicable to this case in the event it is litigated in New York.

While analysis of the relevant factors overwhelmingly suggests that Plaintiffs' choice of forum here is entitled to great deference, this "is only the first level of inquiry," <u>Iragorri</u>, 274 F.3d at 73, and "simply recalibrate[s] the balance for purposes of the remaining analysis." <u>Norex Petroleum, Ltd.</u>, 416 F.3d at 157. This Court must go on to consider whether Brazil is "an adequate alternative forum." In the event that Brazil is an "adequate alternative forum," this Court must then weigh a number of private and public interest factors, as discussed below. <u>Iragorri</u>, 274 F.3d at 73.

## B. <u>Brazil Is An Adequate Alternative Forum</u>

"To secure dismissal of an action on grounds of <u>forum</u> <u>non</u> <u>conveniens</u>, a movant must demonstrate the availability of an adequate alternative forum." <u>Norex Petroleum, Ltd.</u>, 416 F.3d at 157. "'An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute.'" <u>Id.</u> (quoting <u>Pollux Holding Ltd. v. Chase Manhattan Bank</u>, 329 F.3d 64, 75 (2d Cir. 2003)). However, "'the availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum,' nor on identical remedies." <u>Norex Petroleum, Ltd.</u>, 416 F.3d at 158 (quoting <u>PT United Can Co. v. Crown Cork & Seal Co.</u>, 138 F.3d 65, 74 (2d Cir. 1998)).

Petrobrás states that it "is amenable to service of process in Brazil, and, in any event, will consent to the jurisdiction of the appropriate Brazil[ian] court." (Def. Br.

16)  The prosecution of numerous actions against Petrobrás on the bonds at issue clearly evidences that Brazilian courts "permit[] litigation of the subject matter of the dispute."  See Norex Petroleum, Ltd., 416 F.3d at 157.  (See Def. Exs. 6-13)  Plaintiffs, while not conceding that Brazil is an adequate alternative forum, present no arguments to the contrary.  (Pltf. Br. 20)  Accordingly, based on the record thus far, this Court concludes that Brazilian courts would provide an adequate alternative forum for the current actions.

Courts "will not dismiss for forum non conveniens . . . merely because an adequate alternative forum exists," however.  Ancile, 2009 WL3049604, at *7.  Instead, an analysis of various private and public factors must be conducted.

### C.    The Public and Private Interest Factors Do Not Favor Dismissal

The final step in a forum non conveniens analysis is to balance factors of private and public interest.  Private interest factors include:  "(1) ease of access to evidence; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) if relevant, the possibility of a view of premises; and (5) all other factors that might make the trial quicker or less expensive."  DiRienzo v. Philip Servs. Corp., 294 F.3d 21, 29-30 (2d Cir. 2002) (citing Gilbert, 330 U.S. at 508); see also Iragorri, 274 F.3d at 73-74.  Public interest factors include:  "(1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the 'local interest in having localized controversies decided at home;' and (4) avoiding difficult problems in conflict of laws and the application of foreign law."  DiRienzo, 294 F.3d at 31 (quoting Gilbert, 330 U.S. at 508-09); see also Iragorri, 274 F.3d at 74.

1.       **Private Interest Factors**

In considering the private interest factors, "'the court should focus on the precise issues that are likely to be actually tried, taking into consideration the convenience of the parties and the availability of witnesses and the evidence needed for the trial of these issues.'"  Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine, 311 F.3d 488, 500 (2d Cir. 2002) (quoting Iragorri, 274 F.3d at 74).  Petrobrás argues that "[a]ccess to proof is a particular problem," because Brazil has not signed either of the two international conventions regarding evidence in civil and commercial matters.[9]  (Def. Br. 18).  Because these actions involve a contract dispute, however, the primary physical evidence at issue is the bonds themselves, which are already in the record and translated into English.  The parties do not argue that the bonds are ambiguous on their face or that this Court will require extrinsic physical evidence – other than Brazilian case law – to interpret them.  See, e.g., J.A. Apparel Grp. v. Abboud, 569 F.3d 390, 396-97 (2d Cir. 2009).  To the extent Petrobrás intends to offer additional physical evidence, such as company records and communications, it has not explained what obstacles exist to presenting such materials in this Court.

Petrobrás has indicated that it may seek testimony from current and former employees and from bondholders who have attempted to redeem or convert, the majority of whom reside in Brazil.  (Def. Br. 17; Reply 7-8)  Plaintiffs note, however, that

---

[9]  Hague Convention on Service Abroad of Judicial and Extra Judicial Documents in Civil and Commercial Matters, November 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163; Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters, March 18, 1970, 23 U.S.T. 2555, 847 U.N.T.S. 231.

Petrobrás has not identified any specific witnesses in Brazil, and that the Company presumably could compel the testimony of its own employees.  (Opp. at 22)

It also appears that testimony of relevant witnesses could be taken in Brazil for use in litigation in New York.  While U.S. attorneys are not permitted to take depositions in Brazil, depositions for use in foreign courts may be conducted before Brazilian judicial authorities.  (Petrobras Ex. 15 at 1 (U.S. Dep't of State, Brazil Judicial Assistance))  Defendant presumably has Brazilian counsel who could conduct whatever depositions are required.  Letters rogatory are also an available discovery device.  In sum, consideration of access to witnesses and evidence, and the cost associated with obtaining relevant evidence, does not clearly favor dismissal.

The Court also considers the convenience of the parties in assessing the private interests at stake.  See Monegasque De Reassurances S.A.M. v. Nak Naftogaz (In re Monegasque De Reassurances S.A.M.), 311 F.3d 488, 500 (2d Cir. 2002).  Petrobrás argues that "individuals having acquired the bonds second or third hand[] could have no reasonable expectation that disputes concerning the bonds would be resolved anywhere than the courts of Brazil."[10]  (Def. Br. 14)  Petrobrás appears to be arguing that it could not have foreseen defending an action on the bonds in the United States, and that being forced to do so would be unreasonable.  This argument, however, does not address the convenience or inconvenience of defending this action in New York.  As noted above,

---

[10]  Petrobrás notes that the bonds "were created under Brazilian law and issued in Brazil some 50 years ago to individuals possessing certificates evidencing payment of the compulsory annual fee paid by automobile owners in Brazil between 1954 and 1957," and that "[t]he bonds were issued in Brazil, are written in Portuguese, and reference Brazilian law concerning, inter alia, requirements to exercise conversion rights."  (Def. Br. 14)

Petrobrás has ample financial resources and has already retained competent U.S. counsel. While defending these actions in New York will involve some expense, Petrobrás has not suggested that it will experience any real inconvenience.  Plaintiffs, on the other hand, have credibly stated that they are without sufficient financial resources to prosecute these actions in Brazil and have no familiarity with or contacts in Brazil.  (Rogers Decl. ¶¶ 4-5; Burlew Decl. ¶¶ 4-5; see Pltf. Br 16)  The expense and inconvenience Defendant will incur in litigating these actions in New York is far outweighed by the expense and inconvenience Plaintiffs would face if forced to litigate their claims in Brazil.  See Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 107 (2d Cir. 2000) ("the additional cost and inconvenience to the defendants of litigating in New York is fully counterbalanced by the cost and inconvenience to the plaintiffs of requiring them to reinstitute the litigation in England – especially given the plaintiffs' minimal resources in comparison to the vast resources of the defendants.  These considerations cannot justify overriding the plaintiffs' choice of forum.").

Finally, Petrobrás argues that its inability to implead third-party defendants, namely the State of Brazil, weighs in favor of dismissal.  (Def. Br. 18). According to the terms of the bonds and the law governing them, however, Brazil is already jointly liable for their nominal value as a matter of law and contract.  (Petrobrás Ex. 1 (Series 1 Bearer Bond) & 3 (Series 4 Bearer Bond); Ex. 5 (Brazil Law No. 2.004 (Oct. 3, 1953))  Thus, Brazil has explicitly assumed liability for the bearer bonds held by Plaintiffs.  See Matthews v. CTI Container Transport Int'l, Inc., 871 F.2d 270, 281-82 (2d Cir. 1989) (holding that foreign state entity waived its right under FSIA to a non-jury trial

where it had agreed to indemnify a third party for all liability).  In any event, Petrobrás

could file a separate indemnification action in Brazil and thus avoid the issue altogether.

### 2.   <u>Public Interest Factors</u>

The first public interest factor – administrative difficulties associated with

court congestion –  favors neither forum.  While "this Court can accommodate these

cases on its calendar . . . there is no indication of significant court congestion in . . . the

Brazilian courts."  <u>In re Air Crash near Peixoto De Azeveda, Brazil on September 29,</u>

<u>2006</u>, 574 F. Supp. 2d. 272, 288 (E.D.N.Y. 2008).  Petrobrás bears the burden as movant

to establish that court congestion weighs in favor of dismissal.  Where, as here, the

congestion factor recommends neither forum, the Court favors the non-movant's choice

of forum.  <u>See</u> <u>Kimberly-Clark Corp. v. Continental Cas. Co.</u>, No. 3:05 Civ. 0475, 2005

WL 2679698, at *6 (N.D. Tex. Oct. 19, 2005).

The second and third public interest factors involve the unfairness of

imposing jury duty on U.S. residents with no interest in Brazilian controversies, and the

value in having local interests control the outcome of local controversies.  <u>See</u> <u>DiRienzo</u>

<u>v. Philips Servs. Corp.</u>, 294 F.3d 21, 31 (2d Cir. 2002).  Petrobrás argues that Brazil's

interest predominates, since the bonds "were created pursuant to Brazilian law" and were

"issued by a Brazilian corporation in which the government of Brazil owns [a] majority."

(Def. Br. 19, <u>see</u> Reply 8)  "United States courts have an interest in adjudicating matters

affecting [U.S.] residents," however.  <u>Wiwa v. Royal Dutch Petroleum Co.</u>, 226 F.3d 88,

107 (2d Cir. 2000).  Under these circumstances, the two fora have counter-balancing

interests, and these factors are neutral.

The final public interest consideration – which relates to the need to resolve conflict of laws and foreign law issues – favors dismissal, because foreign state substantive law will likely control here.  "New York's choice of law rules require that determination of contract disputes be governed generally by the laws of the state with the most significant contacts to the contract."  Schwimmer v. Allstate Ins. Co., 176 F.3d 648, 650 (2d Cir. 1999); Brink's Ltd., v. S. Afr. Airways, 93 F.3d 1022, 1030 (2d Cir. 1996). "In contract cases, New York courts now apply a 'center of gravity' or 'grouping of contacts' approach" which considers "the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties."  Brink's Ltd., 93 F.3d at 1030-31 (internal citations omitted). Given that the bonds are written in Portuguese, denominated in cruzeiros, and were originally issued to Brazilian automobile owners, it is evident that the initial place of contracting and the place of negotiation and performance is Brazil.  (See Def. Br. 14). Furthermore, Petrobrás' principal place of business is in Brazil.  (Id. at 17)  Since neither of the Plaintiffs reside or are domiciled in New York, Brazil has a more compelling interest than New York in having its law apply.[11]  (See Cmplt. ¶ 1)

"'[T]he need to apply foreign law is not in itself a reason to apply the doctrine of forum non conveniens' . . . and [courts] must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform."  Manu Intern., S.A. v. Avon Products, Inc., 641 F.2d 62, 67-68 (2d Cir. 1981) (quoting Olympic Corporation v. Societe Generale, 462 F.2d 376, 379 (2d Cir. 1972)).

_____

[11]  Plaintiffs do not dispute that Brazilian law applies to these actions.

Analysis of the private and public interest factors indicates that the great deference due Plaintiffs' choice of forum is not overcome here. Accordingly, this Court will not exercise its discretion to dismiss these actions for <u>forum</u> <u>non</u> <u>conveniens</u>.

## III.   <u>THE BEARER BONDS' TERMS DO NOT REQUIRE DISMISSAL</u>

Defendant also argues that this Court is required to dismiss these actions for failure to state a claim under Fed. R. Civ. P. 12(b)(6), because claims similar to those raised by Plaintiffs have been rejected in numerous Brazilian court decisions.[12] The evidence currently before this Court, however – including the declarations of Luiz Carolos Sturzenegger, Celio de Oliveira Borja, and Patrick J. Hurford, and translated copies of several Brazilian court opinions – is insufficient to demonstrate that Plaintiffs' claims are foreclosed as a matter of law. Indeed, the parties' declarations concerning Brazilian law and case citations contradict each other. (<u>Compare</u> Lustosa Decl. ¶¶ 3-4 <u>with</u> Borja Decl. ¶¶ 7-8) Moreover, the Brazilian precedents provided to this Court do not involve parties such as Plaintiffs, who bought bonds second-hand decades after original issue and in another country, and thus cannot be said to have sat on their rights.

Furthermore, it is hardly self-evident from the language of the bonds that Plaintiffs' conversion rights are tied to the maturity dates specified for redemption. The relevant language from the bonds states:

---

[12]  In its moving papers, Defendant also argues that "plaintiffs' claims are untimely on the face of the complaints," because of New York's six-year statute of limitations for breach of contract. (Def. Br. 21-22) Defendant incorrectly argues, however, that the limitation period began to run from the maturity dates of the bonds – December 31, 1977, 1979 and 1980 – rather than the date the action accrued according to the facts pleaded in the Complaints. The Complaints clearly allege that Defendant's breach occurred on June 25, 2009, when Petrobrás refused Plaintiffs' conversion requests, giving Plaintiffs until 2015 to assert breach claims. Defendant drops this argument in its Reply Brief. (Reply 9-10)

1st)  Redemption as from January 1, 1958, so that it is fully paid up on December 31, 1977;
. . . .
6th)  Petroleo Brasileiro S.A. – Petrobrás entitles to the holder of this obligation the option for receiving preferred nominative shares without voting rights, after the bond party meets the requirements of the Corporation Law and Section 18 of Law No. 2004 of October 3, 1953.

(Hurford Decl., Ex. 1)[13]

Defendant argues that these clauses should be read together, and that "[t]he right to convert the Petrobras Series 1, Series 3 and Series 4 bearer bonds at issue[] into preferred shares of Petrobras existed only during the applicable redemption periods." (Def. Br. 21)  The plain language of the bond requires no such interpretation, however. Defendant was free to place an explicit time limit on the conversion right – as it did with the redemption right – but failed to do so.  In sum, the plain language of the bonds presents no obvious bar to Plaintiffs' claims.[14]

_____

[13] The parties agree that – except for the dates of redemption set forth in the first clause – each series of bond contains identical language.  (Opp. at 10 n.5)

[14] The Court also requires additional briefing on the question of whether Brazilian law controls all aspects of these actions.  As a court in the Northern District of New York has recently summarized:

"The general rule appears established that for the purpose of deciding whether to apply local law or foreign law, statutes of limitations are classified as 'procedural.'"  Id. (citing Stumberg, Conflict of Laws 147 (1951); Lorenzen, Statutes of Limitation and the Conflict of Laws, 28 Yale L.J. 492 [1919]).  "Hence the law of the forum controls."  Id. (citations omitted).  "This rule has been criticized . . . [because] the foreign statute, unlike evidentiary and procedural details, is generally readily discovered and applied, and a difference in periods of limitation would often be expected to influence the choice of forum."  Id. (citations omitted).  Nonetheless, "this general rule is firmly embedded in our law."  Id.

"But as might be expected, some legislatures and courts, perhaps recognizing that in light of the rationale of the underlying conflict-of-laws doctrine it is anomalous to classify across-the-board statutes of limitation

## CONCLUSION

For the reasons stated above, Defendant's motions to dismiss (09-cv-8227,

Dkt. No. 5; 09-cv-8228, Dkt. No. 7) are DENIED.  The Clerk of the Court is directed to

terminate these motions.


Dated: New York, New York             SO ORDERED.
      September 27, 2010

                                 Paul G. Gardephe
                                 United States District Judge

---

as 'procedural,' have created exceptions to the rule so categorizing such statutes." Id. at 155.  "A court-made exception, and the one with which we are concerned here, is that where the foreign statute of limitations is regarded as barring the foreign right sued upon, and not merely the remedy, it will be treated as conditioning that right and will be enforced by our courts as part of the foreign 'substantive' law." Id. (citation omitted); Whisenhunt v. Sylvania Corp., 671 F. Supp. 214, 216 (W.D.N.Y. 1987) ("An exception to this general rule exists when the right sued upon was created by a foreign statute under which the commencement of an action within a specified period is a condition precedent to securing relief.").

Rusyniak v. Gensini, 629 F. Supp. 2d 203, 232 (N.D.N.Y 2009) (quoting Bournias v. Atlantic Maritime Co., 220 F.2d 152, 154 (2d Cir. 1955)).